## SUBLEASING OF PROPERTY HELD UNDER AN EXPIRING LEASE WITH PRIVILEGE OF PURCHASE.

Common Pleas Court of Cuyahoga County.

HENRY L. CROSS v. COMMERCIAL REAL ESTATE CO.

Decided, February, 1914.

*Covenants—Forfeitures—Leases—Sub-lease Executed Before Termination of Original Lease Containing an Option of Purchase—Knowledge of Sub-lessee's Violation of Terms of Original Lease is a Necessary Prerequisite to Forfeiture for Unlawful Occupation—Statutory Forfeiture for Unlawful Sale of Intoxicating Liquors—Section 6207.*

1. Where a lease for a term of years contains an option of purchase on the last day of the term and also a clause of non-assignment without the written consent of the lessor, a new lease made by the lessee for a term extending beyond that of the original lease will not be treated as a ground of forfeiture for assignment without written consent but rather as a sub-lease, where it appears that the lessee acted with the intention in good faith of obtaining the fee on the last day of the term, and of treating the new lease as a sub-lease and not as an assignment, and a proper tender of purchase was in fact made at the stipulated time, and the conditions of the new lease as to rental reserved, building conditions, insurance and right of re-entry are different from those in the original lease.

2. Forfeiture of a lease for breach of covenant "to permit no unlawful occupation" will not be declared unless the lessee has knowledge of the proscribed use; and where a lessee realty company sublets the premises under a like condition against such use, the covenant will not be held to have been violated by the maintenance of a house of ill-fame and the unlawful sale of liquor on the premises, where the company was without knowledge that such use of the premises had been made or was intended.

3. Neither can such a forfeiture be declared under the statute for the unlawful sale of intoxicating liquors by a sub-lessee, where the lessee company was without knowledge that such sales were being made or were contemplated.

*Marvin, Smart, Marvin & Ford,* for plaintiff.

*Squire, Sanders & Dempsey, Cook, McGowan & Foote* and *Hidy, Klein & Harris,* contra.

GOTT, J.

The plaintiff, Henry L. Cross, was the owner of 100 feet of land fronting on Euclid avenue in the city of Cleveland, and on January 3, 1895, he duly executed an indenture of lease, coupled with an option to purchase, to William A. Vliet and Charles L. Pack, for a period of fifteen years, or until December 31, 1909. On September 24, 1895, with the written consent of the plaintiff, Pack and Vliet duly assigned the lease to the defendant, the Commercial Real Estate Company, which assignment is as follows:

"Cleveland, Ohio, September 24, 1895. I, Henry L. Cross, the lessor mentioned in the lease dated January 3, 1895, referred to in the within assignment of lease, do hereby consent to said assignment as provided for in the sixth article of said lease dated January 3, 1895. The consent is granted without releasing the said Charles L. Pack and William A. Vliet from any of the obligations of said original lease so dated as aforesaid. Henry L. Cross."

At this time, Euclid avenue, at the location of the Cross homestead, was a residence district, though it was so closely situated to the business part of Euclid avenue that the original lessees, Pack and Vliet, foresaw that in the course of years business would be pushed down Euclid avenue, and the value of the Cross property greatly enhanced.

The Commercial Real Estate Company, after the assignment of the lease to it, entered into possession of the property and immediately began subleasing the premises for residence purposes, and later for rooming-house purposes; and the company, by the assignment, being in privity with the plaintiff, will hereafter be designated as the lessee. Business, however, it is claimed by the defendant, was much slower in moving down Euclid avenue than it was anticipated, and the defendant realty company claims that up to the last year of the lease it had lost in the neighborhood of $20,000.

This indenture of the date of January 3, 1895, was not only a lease, but it contained an option to purchase at the end of the term for the sum of $90,000; and this suit is at this time one

concerning certain acts of alleged forfeiture of the lease during the term of the lease, and therefore an ending of the option to purchase, and it can be best understood and followed by an analysis of the clauses of the instrument.   They are as follows:

First.   ''Rent of $3,000 in semi-annual payments on April 1 and October 1, during the continuance of the lease, to be deposited to the credit of lessor at the Guardian Savings & Trust Company.''

Second.   ''As a part of the consideration of said lease, and in addition to the rental hereinbefore provided, said lessee hereby covenants and agrees to indemnify and save harmless the lessor, said ground, the premises demised and improvements thereon, from all taxes and assessments levied and assessed during the term of this lease, beginning with the taxes and assessments for the year 1895 and ending with the taxes and assessments for the year 1909, and free from all charges, liens, penalties and claims for damages chargeable to or payable for or in respect of said ground or the rentals to accrue thereon during said term, and to punctually pay, in addition to the rents above provided for, all such taxes, assessments and other charges as aforesaid and, upon application of said lessor in writing, to furnish said lessor with written evidence duly certified, that any and all such claims are duly satisfied.   And the said lessee does hereby agree to pay the rents, taxes, assessments and other charges as hereinbefore provided, and the said lessee hereby agrees to promptly and fully obey and comply with all requirements, rules, regulations, laws and ordinances of all legally constituted authorities in any way affecting said premises, buildings and improvements on or about the same, or the use of the same, existing at any time during the continuance of this lease, and to permit no unlawful occupation to be carried on upon said premises and no use to be made of any part thereof contrary to any law or ordinance governing the same.''

Fourth.   *   *   *   ''Provided, however, that said lessee shall have and is hereby given the privilege of altering, removing and destroying the buildings and improvements now upon said premises, but only on the condition that the lessee shall proceed immediately after the altering, removing or destroying of such buildings and improvements, to so alter or repair such buildings and improvements, or construct a new building upon said premises that the same shall be of equal or greater value when completed than the one altered, removed or destroyed; and lessee agrees to and does hereby become responsible to lessor

for any and every damage that may accrue to lessor by reason of the failure of lessee to finish and complete such altered building or to replace such removed or destroyed building."

Sixth. "The lessee further covenants and agrees not to assign or transfer this lease at any time, except with lessor's consent in writing, unless the rents and all charges, taxes and assessments, liens, penalties and claims for damages which the lessee has herein covenanted to discharge, have been duly discharged and satisfied, nor unless the assignee shall expressly assume the lessee's engagements hereunder, nor unless the lessee shall have first placed in the hands of the lessor for inspection during the period of ten days a legal and sufficient instrument of assignment and acceptance which shall, before its execution, be satisfactory to lessor, nor unless by instrument recorded at or about the time of delivery in the proper recorder's office. Provided, however, that the lessee may at any time, directly or by conveyance in trust for that purpose, mortgage his estate in the premises to secure any actual debt, and make all insurance exceeding $10,000 above stipulated payable in case of loss to said trustee or mortgagee. It is covenanted and agreed that no assignment hereof shall be made except in accordance with the above stipulation or by way of devise."

Eighth. "This lease is made upon the condition that the lessee shall punctually perform all covenants and agreements herein set forth to be performed by said lessee. and that if at any time the rent, taxes, assessments and other charges and payments aforesaid, or either of them, or any part thereof, shall become in arrears and unpaid for the period of ninety days after becoming due, or if any of the covenants or agreements aforesaid shall not be performed as hereinbefore stipulated and agreed to be performed by said lessee, the said lessor, at any time thereafter, shall have full right at his election, without further demand or notice, to enter upon the above described premises and bring suit for and collect all rents, taxes, assessments, payments or other charges which shall have accrued up to the time of such entry, and thenceforth from the time of such entry this lease shall become void to all intents and purposes whatsoever, and this lease and all improvements made upon said premises shall be forfeited to said lessor without compensation therefor to said lessee. Provided, also, that for rents due and non-performance of condition, the lessor may sue at once but not enter upon forfeiture for three months."

Tenth. "Lessor hereby gives and grants unto said lessee, their heirs, executors, administrators and assigns, an option to purchase the premises described in this lease at the expiration

of the term hereof for the sum of $90,000 cash.   In the event
said lessee desires to exercise this option, they shall notify said
lessor, his heirs, executors, administrators or assigns, of his
election to purchase said premises, by delivering, not more than
four months nor less than thirty days prior to the expiration
of the term of this lease, written notice of such election to said
lessor, his heirs, executors, administrators or assigns, or by de-
positing such notice with the Guardian Trust Company, of
Cleveland, Ohio, or at such other place or with such other per-
son or corporation as shall at that time be designated for the
payment and receiving of the rents hereunder.   And, in the
event of the acceptance of this option by said lessee, his heirs,
executors, administrators or assigns, said $90,000 shall be paid
in cash to said lessor, his heirs, executors, administrators or
assigns, on December 31, 1909.   This option is a part of this
indenture and runs with the same.   It is given in consideration
of the punctual payment of the rents provided for hereunder
and the like performance of all of the covenants, agreements,
stipulations, terms and conditions of this instrument.   It can
not be assigned except with this instrument, and shall be ter-
minated by the termination of this lease from any cause what-
soever.''

On March 10, 1909, or about ten months before the expira-
tion of the lease and six months before the defendant could give
notice of its election to purchase under the option, the defend-
ant, the Commercial Real Estate Company, lessee, made, exe-
cuted and delivered to one William M. Brown a lease for the
term of ninety-nine years beginning on the first day of July,
1909, six months before the expiration of the original lease.
This ninety-nine year lease from the defendant, the Commercial
Real Estate Company, to Brown, included all of the Cross prem-
ises and also fifty feet of land immediately east of the Cross
premises which was owned in fee by the Commercial Real Es-
tate Company, and, in this new lease Brown agreed to erect a
much more valuable building than was provided for in the lease
in question from Cross to Pack and Vliet.   The covenants are
different.   The Commercial Real Estate Company had the right
of re-entry for condition broken; the rent is increased to such
an extent that it shows a difference in the value of the premises
of over $200,000.

The Commercial Real Estate Company also executed an option to purchase to Brown for the whole frontage of 150 feet, to be exercised only after December 31, 1909. This option was by separate agreement, but was made at the same time as the ninety-nine years lease. Cross, lessor, had reserved in his lease the wood mantel, mirror and chandeliers, with the right to remove them at any time he might elect, but in the event of the remodeling or a tearing down of the old homestead, he was to remove them upon reasonable notice to him by the lessee; and on May 22, 1909, the Commercial Real Estate Company notified him to so remove the mantel, mirror and chandeliers, which he did, and Brown began tearing down the Cross house for the purpose of erecting the new building.

On August 14, 1909, the plaintiff brought suit against the original lessees, Pack and Vliet, for the recovery of the possession of the premises on grounds of forfeiture, claiming a violation of covenant "two" of the lease, in that the defendants had permitted the premises to be used for the purpose of an assignation house, and had permitted the unlawful sale of intoxicating liquor on the premises; and, second, that the defendants had violated covenant "sixth," not to assign the lease without the written consent of the plaintiff, lessor, and plaintiff prayed to be restored to possession.

It seems that the plaintiff had either neglected to inform his counsel of his consent to the assignment from Pack and Vliet, or had forgotten that he had given his consent to such assignment; and upon discovering the same, the plaintiff filed his amended petition, which was the same as his original petition except that the Commercial Real Estate Company was made a party, and the assignment and the consent to the same were averred.

At the time specified in the opinion, September 2, 1909, the defendant, the Commercial Real Estate Company, duly notified the plaintiff, Cross, of its election to take the premises as provided in the option, and on December 31, 1909, the last day of the lease, and the day named in the option to purchase, the defendant duly tendered the $90,000 in gold and demanded a

deed from the plaintiff, which he refused. On December 30, 1909, the day before the last day of the lease, a second amended petition was filed, and in November, 1911, the case, being at issue by proper answers of the defendant, came on for trial before another branch of this court. That battle, however, was not finished, and the trial was stopped and plaintiff was granted leave to file a third amended petition and Brown was made a party defendant.

The original action was one in ejectment for a breach of the covenants of the lease. At the time it was filed, the lease had five months to run. But the leasehold ended on December 31, 1909; and the defendant, the Commercial Real Estate Company, or Brown if he is assignee, after that date held possession, not by the terms of the lease, for it had expired, but held possession because it claimed to have exercised its option, made its tender according to the terms of the option, and the action was still one in ejectment. By clause "ten" of the lease, "This option is a part of this indenture, and runs with the same. It is given in consideration of the punctual payment of the rents provided for hereunder and a like performance of all of the covenants, agreements, stipulations, terms and conditions of this instrument. It can not be assigned except with this instrument, and shall be terminated by the termination of this lease from any cause whatsoever." So that if the lessees, by any act of theirs, terminated or forfeited their lease during its term of fifteen years, such act would also forfeit the option, and plaintiff could bring an action to cancel it or he could plead such act to any action for specific performance of the option contract. It is true, too, that all the covenants, conditions, etc., of the lease are made conditions, covenants, etc., of the option; so that the instrument did not provide that the option "shall be terminated by the termination of this lease from any cause whatsoever," yet the legal effect is to rewrite all the conditions and covenants of the lease in the option as fully as though they were repeated in the option, and plaintiff has the same rights under the option for a violation of its terms as he has for a violation of the terms of the lease.

This indenture is a single instrument, founded and supported by one entire consideration concerning two subjects, a lease and an option, and it contains specific covenants and stipulations touching the obligations of the parties as lessor and lessee, and as vendor and vendee in the event of the election to purchase (*Gilbert* v. *Port*, 28 Ohio St., 276). Ejectment was the remedy until April 11, 1910, when Cross entered into a land contract with Brown, who was in possession up to that time by virtue of his ninety-nine year lease from the Commercial Real Estate Company, whereby Cross agreed to convey to Brown the premises in question, and to give him a warranty deed as soon as he could get his title cleared, that is to say, get this option of the date of January 3, 1895, from Cross to Pack and Vliet canceled. This action of Cross in granting the land contract to Brown extinguished his remedy of ejectment and gave birth to the action as it now stands, an action to cancel his contract, and thereby quiet his title as against those who claimed any right under that contract.

### THE ISSUES.

The plaintiff therefore claims, as it appears to me, that he gave this option, together with the lease, to Pack and Vliet, that they assigned it to the defendant, the Commercial Real Estate Company; that this option contained all the above enumerated covenants; that he performed all the conditions and agreements on his part to be performed, but that the defendant, the Commercial Real Estate Company, did not so perform its covenants and agreements, but that it wrongfully, and without any right, did break the covenants and agreements and failed to perform the conditions on its part to be performed in this, to wit:

First, that it violated the covenant not to permit the premises to be used for any unlawful purpose (clause II of the option and lease) by permitting and allowing a house of ill-fame to be conducted thereon, during the continuance of the lease, and a further violation of that clause by permitting said premises to be used for the unlawful sale of intoxicating liquor, which acts were both in violation of the covenants of the lease and the or-

dinances of the city of Cleveland and the laws of the state of Ohio.

Second, that, in violation of the covenant (No. VI) "not to assign except with the written consent of the lessor," the defendant the Commercial Real Estate Company did, on March 10, 1909, execute a lease of all of said premises to the defendant, Brown, for a term of ninety-nine years beginning on July 1, 1909, and ending on June 30, 2008; and that simultaneously with the execution of the said ninety-nine year lease, the Commercial· Real Estate Company granted an option to purchase to Brown; that by so doing it assigned away all of its term and interest in said premises; that this was an assignment in law, and that it was done without knowledge or consent in writing of the plaintiff; that Brown went into possession on July 1, 1909, and began the tearing down of the buildings.

The petition also sets forth the option, and that the defendant the Commercial Real Estate Company claims the premises by virtue of the option; that said option and adverse claim is a cloud upon his title; that the defendant the Commercial Real Estate Company is collecting the rent from Brown in violation of plaintiff's right to receive the same, and prays for an accounting, that the option be canceled, and plaintiff's title quieted, and for such other and further relief as equity and good conscience may allow.

The defendant denies that it has violated any of the terms of either the lease or the option; admits that it made the ninety-nine year lease to Brown and gave him an option to purchase, but alleges that this lease and option to Brown is not an assignment of its lease, but that it is a sublease from it to Brown, founded upon the remainder of their leasehold and then upon their right to purchase, their right to a deed in fee simple from the plaintiff on the last day of their leasehold. It alleges that on September 3, 1909, this defendant duly notified the plaintiff of its election to exercise its option to purchase, and avers that on December 31, 1909, the day named in the option, it duly tendered to plaintiff the sum of $90,000 in gold, as in said option required, and demanded a deed for said premises.

As a further defense by way of waiver and estoppel, the defendant alleges that on June 15, 1896, plaintiff and his wife, Stella Cross, sold, assigned and transferred to the Guardian Trust Company all their right, title and interest in and to said lease, the rents therein reserved and the option therein given, and that since March 10, 1909, and later than the filing of his petition, plaintiff, by other instruments in writing, has assigned and transferred all his interest in said lease, the rents reserved therein and the option given, to said trust company.

By its supplemental answer, the defendant avers that the plaintiff and his wife, on August 29, 1913, gave, granted, bargained, sold and conveyed unto the National City Bank, of Cleveland, the premises about which arises this controversy, and sold, assigned and transferred to said bank all their right, title and interest in and to the lease and option, and by said instrument of conveyance warranted and covenanted that he, the said Cross, was well seized of the premises and was the true and lawful owner of the lease and option.

Defendant further avers that Cross, for the consideration of one dollar, ratified and confirmed the lease from Brown to the Cleveland Athletic Club of the upper stories of the building; and that, inasmuch as Brown is in possession under them, therefore Cross has recognized the validity of its lease to Brown.

Defendant avers that it sought to obtain from plaintiff, in December, 1908, and in the early part of 1909, a deed in advance; that it was then negotiating with Brown for the ninety-nine year lease, and that such facts were known to plaintiff and his agent, the Guardian Trust Company; that the lease to Brown for ninety-nine years was made on March 10, 1909, and that plaintiff and the Guardian Trust Company were advised of the making of the lease and made no objection thereto, but acquiesced in the same, and, with such knowledge, received the rent due April 1, 1909; and that by reason of these acts, conduct and silence on the part of plaintiff, and his wife, the plaintiff can not maintain this action; that he has acknowledged and recognized the validity of the original lease, and has waived any forfeiture, and is estopped from claiming a forfeiture of the instrument.

By way of cross-petition, the defendants, by proper averments, ask for specific performance of the option to purchase.

Plaintiff by reply admits the execution of the instruments to the Guardian Savings & Trust Company, but avers that such instruments were mortgages for security for certain loans, and that said mortgages contained the usual defeasance clauses; admits the execution of the instrument under date of August 29, 1913, from him to the National City Bank; admits that he gave, bargained, sold, etc., to said bank the premises described in the fourth amended and supplemental petition, and that he sold, assigned and transferred to said bank all his right, title and interest in the lease, and the rents reserved therein, and to the option from himself to Pack and Vliet; and further alleges that he also conveyed to said bank by said instrument all his right, title and interest in the land contract from himself to Brown of the date of April 11, 1910; and he says that said instrument was a conditional instrument, and given merely as security for a loan which was due the bank. He admits that he received the rents due April 1, 1909, but denies that he had any notice or knowledge of the lease to Brown at that time, and alleges that the defendant, the Commercial Real Estate Company, without his knowledge or consent, executed said lease, and, in order to keep the knowledge of the making of such lease from him, the defendant withheld the lease from record until September, 1910; and he denies that any of his conduct or acts misled the defendant into making the lease to Brown, or that his acts or conduct constitutes a waiver of the forfeiture or is an estoppel to his prosecution of this suit.

Plaintiff's answer to the defendant's cross-petition for specific performance is practically the facts and averments of his petition. He admits the notice to exercise the option, and the tender of the $90,000 in gold, and that the same was refused:

FINDING OF FACT AND LAW AS TO THE ALLEGED ILLEGAL USE OF THE PREMISES.

The court finds from the evidence that one Mrs. Sherman was a tenant of the defendant, the Commercial Real Estate Com-

pany, and that during her tenancy she conducted a house of ill-fame where persons of the opposite sex met for the purpose of prostitution and lewdness; and that, during the same tenancy, there were unlawful sales of intoxicating liquors on such premises. That the said Mrs. Sherman occupied the premises and conducted said house of ill-fame and made illegal sales of intoxicating liquors from October, 1906, to June, 1907; and the court further finds that such illegal use of the premises in question is confined entirely to the tenancy of Mrs. Sherman.

The court further finds that neither the defendant the Commercial Real Estate Company nor any of its officers had any knowledge whatsoever that a house of ill-fame was being conducted there by the said Mrs. Sherman, nor did it or they know or have any reason to believe that there were unlawful sales or giving away of intoxicating liquor on said premises by the said Mrs. Sherman. And the court further finds that neither the Commercial Real Estate Company nor its officers. knowingly permitted said illegal or unlawful uses of said premises.

Do these facts constitute a statutory forfeiture of the lease?

The statute directly involved is Section 4361, Revised Stat-$utes (6209, General Code), which provides:

"    *    *    *    The unlawful selling or giving away of intoxicating liquors shall work a forfeiture of all rights of the lessee or tenant under any lease or contract of rent upon premises where such unlawful sale or giving away takes place."

If a sub-lessee makes unlawful sales of intoxicating liquors, will that work a forfeiture of the lease from the lessor to the lessee? This question has never been passed upon by the courts of Ohio. In 1854 (52 O. L., 153) the Legislature passed an act "Providing against the Evils Resulting from Sale of Intoxicating Liquor;" and in 1879 (67 O. L., 101), Section 7 was amended to read as it now reads in Section 4361, Revised Statutes, and Section 10 amended to read as now reads, Section 4364, Revised Statutes. Both of these sections have been construed by our Supreme Court where the question is between the lessor and lessee, but not a great deal of aid is given to the solution of the question here presented.

In *Zink* v. *Grant*, 25 Ohio St., 355, the court fell into error as to the section which applied to that case, using Section 10 instead of Section 7; but in its opinion it uses the following language:

"It would require the most explicit terms to justify the conclusion that the Legislature intended to deprive a lessor who had not offended against the policy of the law, in thought or deed, of the benefit of his contract.

"The guilty lessor takes nothing by his contract, while the innocent is protected in his rights."

In *Goodall* v. *Brewing Co.*, 56 Ohio St.. 257, the Supreme Court construed Section 4364, Revised Statutes (originally Section 10), which was passed at the same term as the section in question. Section 4364 provided that "All contracts whereby any premises are rented, and the same shall be used and occupied for the sale of intoxicating liquors, shall be void." In construing this section, the court read into it, after the words "for the sale of intoxicating liquors," the words "contrary to law." On page 260 the court uses the following pertinent language:

"All sales of intoxicating liquors are not illegal; only such are so that are defined and prohibited; and the sales to which reference is made are such as are defined and prohibited; and none but such sales affect in any way the validity of a contract of lease. * * * To hold otherwise would impute to the Legislature a great want of consistency. Neither a civil nor a criminal liability can with consistency be attached to the doing of a lawful act." * * *

There can be no reason against the validity of contracts that "have for their object simply the lawful conduct of the business."

"It was early announced as a rule of construction in Ohio, that whatever may be the nature or kind of forfeiture, it is never carried beyond the clear expression of the statute creating it."

It should be the policy of the law to punish the guilty and to shield the innocent; and while the statute under consideration was passed by the Legislature for the purpose of checking

the evils resulting from the unlawful sales of intoxicating liquor, yet it would seem to be an unwarranted construction of the statute to say. that the innocent lessee, whose sub-tenant unlawfully sold liquor on the premises, should have his lease forfeited by such unlawful sale. As said by Judge Nye in *State* v. *Maloney*, 6 Dec., 209; 4 N. P., 197, "It is carrying the doctrine too far to hold that a person who leases his property for a legitimate purpose, and who had no knowledge of its use for any other purpose, should be held liable for the unlawful use of said property by the tenant without any knowledge of the unlawful use."

The state of Oklahoma has the following statute:

"All leases between landlords and tenants under which any tenant shall use the leased premises for the purpose of violating any provision of this act, shall be wholly null and void, and the landlord may recover possession thereof as in forcible entry and detainer."

In construing this statute on February 11, 1913, the Supreme Court of Oklahoma held that the lessee's lease was not to be forfeited or canceled at the suit of the landlord, lessor, for an infraction of the statute by a sub-tenant of the lessee, unless the violation was permitted or continued with the knowledge of the lessee. And the court concludes with the following reasoning:

"The unreasonable consequences, if not to say unconstitutional results, which would follow any other holding seem to us to be apparent at a glance. Suppose, to strengthen the example of the case here before us, that Street and Reed owned this entire city block with its several hundred buildings and rooms, and that they leased the entire property to Tull. That Tull then leased it to several hundred different people. who entered upon their occupancy and engaged in their different occupations and uses therein, and then, without the knowledge of either Tull or any of these other sub-lessees, some of them in some distant corner of this property should surreptitiously engage in the illegitimate sale of intoxicating liquors. Is it be contemplated for a moment that the rights and contracts of this great body of people should, because thereof, be swept out of existence, and the primary landlord be permitted to enter and oust all of such innocent holders?

"A statement of the proposition, in our judgment is sufficient to refute the contention; and we therefore hold the judgment of the court was erroneous in holding for cancellation Tull's lease as to the square of ground located in the center of the block, and the case is remanded with instructions to set the said judgment aside and enter one in accordance with this opinion."

The court therefore holds, that the lease forfeited by Section 4361, Revised Statutes, is the lease of the sub-tenant, the one who does the unlawful act; and that the lease of the lessee, who has no knowledge of the unlawful sales of intoxicating liquor, is not forfeited by that statute. To hold otherwise is neither warranted by the words nor intent of the law. Forfeiture being abhorred by the law, should never be carried beyond the clear expression of the statute creating it.

### FINDING AS TO CLAUSE II OF THE LEASE.

The second clause of the lease is as follows:

"As a part of the consideration for said lease, and in addition to the rental hereinbefore provided, said lessee hereby covenants and agrees to indemnify and save harmless the lessor, said ground, the premises demised and improvements thereon, from all taxes and assessments levied and assessed during the term of this lease, beginning with the taxes and assessments for the year 1895 and ending with the taxes and assessments for the year 1909, and free from all charges, liens, penalties and claims for damages chargeable to or payable for or in respect of said ground or the rentals to accrue thereon during said term, and to punctually pay, in addition to the rents above provided for, all such taxes, assessments and other charges as aforesaid and upon application of said lessor in writing, to furnish said lessor with written evidence duly certified, that any and all such claims are duly satisfied. And the said lessee does hereby agree to pay the rents, taxes, assessments and other charges as hereinbefore provided, and the said lessee hereby agrees to promptly and fully obey and comply with all requirements, rules, regulations, laws and ordinances of all legally constituted authorities in any way affecting said premises, buildings and improvements on or about the same, or the use of the same, existing at any time during the continuance of this lease, and to permit no unlawful occupation to be carried

on upon said premises and no use to be made of any part there-of contrary to any law or ordinance governing the same."

The court has already found, under statutory forfeiture, that there was a house of ill-fame conducted by a Mrs. Sherman, a sub-tenant of the Commercial Real Estate Company, upon the premises, and that she unlawfully sold and gave away intoxicating liquor on said premises at said time, and that neither the Commercial Real Estate Company nor its officers had any knowledge as to this unlawful use of the premises, by its sub-tenant.

The claim here presented is, that the defendant the Commercial Real Estate Company violated the covenant "To permit no unlawful occupation to be carried on upon said premises, and no use to be made of any part thereof contrary to any law or ordinance governing the same."

We approach a construction of this clause with the fundamental principle that forfeitures are strictly construed against the person claiming them, and any doubt or ambiguity is to be resolved against the person claiming the forfeiture. *West* v. *Insurance Co.*, 27 Ohio St., 1, 13; *State* v. *Boyce*, 43 Ohio St., 46.

The covenants and conditions in a lease are strictly construed against the lessor, and such construction will be given the language used as to defeat a forfeiture if possible. *Gilbert* v. *Port, supra.*

The defendant contends that the word "permit" implies knowledge, and that there was no violation of this covenant, the court having found that the defendant had no knowledge of the illegal uses by the sub-tenant.

On the other hand, the plaintiff contends that this clause, "to permit no unlawful use," etc., is a covenant that there shall be no unlawful use of the premises in any event, or that the court should adopt the same construction of this covenant in Ohio as was adopted by the courts of Massachusetts as to the covenants "to suffer no unlawful use of the premises," the courts there holding that "an unlawful use of the premises by a sub-tenant is a breach of the covenant to make or suffer any unlawful use of the premises, whether known to the lessor or not."

While the courts of Ohio have passed upon the word permit

·as used in the criminal statutes and as used in pleadings, yet very little aid is given here, for the reason that this case is one for the forfeiture of a lease where every doubt is resolved against the lessor.

*Robinson* v. *Greenville,* 42 Ohio St., 625, was a negligence case against a municipality for permitting the firing of a cannon in the public street, whereby plaintiff was injured, and the allegation that the "authorities permitted" was said to mean, "took no measures to prevent;" but there were other allegations in the petition alleging that the village had full knowledge of the firing of the cannon, and that they took no measures to prevent.

In *Ackerman* v. *Thompson, supra,* heretofore cited, "To permit means either, first, to suffer, or allow to be, to come to pass; or take place by tacit consent or by not prohibiting or hindering; or, second, to grant leave or liberty by express consent; to allow expressly."

There are many decisions in other states supporting each of the contentions herein, but that construction of the word "permit" which has in it the element of knowledge appears the more reasonable one to apply to a forfeiture case.

In *Gregory* v. *United States,* 10 Fed. Cas., 1195, it is said:

"Every definition of 'suffer' and 'permit' includes knowledge of what is done."

Such construction also was given in the following cases:

*Gray* v. *Stienes,* 69 Ia., 124; *Ball* v. *Campbell,* 6 Idaho, 754; *Chicago* v. *Stearns,* 105 Ill., 554; *State* v. *Robinson,* 55 Minn., 169.

I do not believe that the courts of Ohio will follow the doctrine of the Massachusetts cases. It would seem to be both harsh and unjust to apply such a rule in this case. The defendant had entered into a sub-lease to one Krieger, who had occupied the premises for a number of years; and he, with the consent of the defendant, had transferred such lease to Mrs. Sherman, alias Lee. The lease was one of the ordinary form, and such as is used by every landlord in Ohio. That lease had

the usual covenants within it, including the covenant against the sale of liquor.   There was nothing in the appearance of Mrs. Sherman to indicate that she belonged to that class of persons who keep houses of ill-fame.   Nor is there any duty of a landlord to hire watchmen or detectives to keep his premises under surveillance.   This house was located on Euclid avenue, the most prominent street in the city and within a stone's throw of churches and other religious institutions.   Can it be said that the lessee, under these circumstances, failed in his duty in that he "took no measure to prevent" when there was no circumstance which should arouse his suspicion of the unlawful purpose for which the house was being used?

True, the court finds that the house, from October, 1906, to June, 1907, was a house of ill-fame—known in the neighborhood as such—and therefore plaintiff contends should have been known to the defendant.   But if such ill-fame should have been known to defendant, so also should it have been known to the plaintiff, and he could not now complain because of his laches in asserting his right, nor could he complain having such knowledge and having received the rents for two years subsequent thereto.   The truth is, that neither plaintiff nor defendant knew of the unlawful uses of the premises up to July or August, 1909.

What was the intention of the parties?   The whole of clause II should be read and construed together.   Examine it as a whole.

The "lessee covenants and agrees to indemnify and save harmless the lessor, said ground, the premises and improvements thereon from all taxes and assessments * * * and free from all charges, liens, penalties and claims for damages * * * and to punctually pay all taxes, assessments and other charges as aforesaid, * * * to promptly and fully obey and comply with all requirements, rules, regulations, laws and ordinances of all legally constituted authorities in any way affecting said premises, and to permit no unlawful occupation to be carried on upon said premises, and no use to be made of any part thereof contrary to any law or ordinance."

The court holds that the word "permit" has within it the elements of knowledge, and that there being no knowledge on the part of the defendant realty company as to the illegal uses of the premises, there was no violation of the covenant to permit no unlawful use. That if the state placed liens or penalties upon the premises for the unlawful uses by the sub-tenant, Mrs. Sherman, then the plain intention was that the lessee must pay such assessment or penalty, and a failure so to do would have been a plain violation of the covenant and a ground of forfeiture. But the state did not do so. No damage was done the premises, though there was an injury to the public morals. Plaintiff had made a solemn written contract to convey the premises to defendant for $90,000, and defendants desire to stand by said contract and pay said sum therefor. That there was no damage to plaintiff is clearly shown by the fact that defendants agree to pay the contract price. The truth is, that the premises have greatly increased in value, an unearned increment of over $250,000, and that this controversy arises on both sides by reason of that fact. Contracts are not to be set aside except upon clear and convincing proof of a violation of their terms. Equity abhors a forfeiture, and will never grant relief except where the violation is plain, certain and substantial, and the courts holds that there was no violation of covenant II.

### FINDING AND LAW AS TO THE ASSIGNMENT.

It is admitted that the ninety-nine year lease and the option from the defendant to Brown was made on March 10, 1909, and that such lease was to begin on July 1, 1909, and that the ninety-nine year lease used up all of the balance of the fifteen year term of the original lease, and extended over ninety-eight years beyond the original term. It is admitted that the lessee, the Commercial Realty Company, at the time it made the ninety-nine year lease, had an option to purchase on the last day of the term; and that the court finds that it at that time intended to exercise its option and get the fee on said last day. The court finds that the premises conveyed in the ninety-nine year lease were different; that it contained the original 100 feet belonging

to plaintiff and fifty feet owned by defendant; that it reserved the right in the defendant to re-enter for breach of covenant; that the rental was different; that there were covenants in the instrument not in the original; that in form it was a lease and not an assignment, and that the parties thereto intended it as a lease, and not an assignment.

WAS THE NINETY-NINE YEAR LEASE AN ASSIGNMENT IN LAW?

This question has, after a study of all the authorities, caused more trouble than any question presented in the case. There seem to be authorities on each side of the proposition, but the text-books generally answer in the affirmative. *Tiffany, Landl. & Ten.*, Section 151; *Wood, Landl. & Ten.*, Section —; *Taylor, Landl. & Ten.*, Section 16.

And there are many decisions, ancient almost to the point of veneration, to the same effect. It is to be noted, however, that the question usually arises in those cases when the landlord is seeking to hold the under-tenant for rent due by the terms of the original lease. Like many of our laws in regard to real property, it had its origin in the feudal system. To the over-lord a service of fealty was due from the tenant by virtue of his tenure; and if the lessee parted with his whole estate, he who took over this estate was put in the place of the original tenant and was bound by the original tenant's covenant to render the military service. Such is the origin of the rule which plaintiff seeks to enforce in this action. Under these holdings, if the original tenant held but the very shred of his estate, one minute out of a ninety-nine year lease, a new estate was carved out of the original estate and there was a sub-tenancy and not an assignment, and the original tenant marched off to war while the sub-tenant stayed at home and attended his harvest.

There is no case by four corners in Ohio. In 1846, however, the Supreme Court had before it the case of *Jones v. Smith*, 14 Ohio, 606. On May 25, 1835, one Dixon leased to the defendant Smith and to one Gray a two-story house with a certain quantity of household furniture for a term of five years, with

rent at $120 per year.   On September 4, 1837, Dixon conveyed
to plaintiff's intestate the house and lot but not the furniture.
Suit for rent by the new landlord, with answer that defendant
had paid all rent in full to Dixon.   The covenant is to pay
rent for the use of both the realty and the personalty.   The
consideration is entire.   The realty was conveyed, the personalty
was not.   The court, on page 609, uses this language:.

"How much of .the entire rent is the consideration for the
realty, and goes to the assignee for the lease, and how much
should be retained out of the personalty for the lessor, from
whom it is not conveyed by any grant or assignment? In our
view, no such partition can be made, and if the whole term, and
the whole interest in the term, is not conveyed, it is no more
an assignment which can be enforced in his own name, by the
assignee, of the lessor, than the assignee of the lessee."

*Fulton* v. *Stuart,* 2 Ohio, 216, lease of a part of the premises
for the whole term, and the court held:

"Where a lessee assigns a part of the premises leased to a
third person for the whole period of time of the lease, it is but
an under leasing and the lessor can sustain no action on the
lease for rent against the assignee."

The court say:

"In this case the declaration states that the defendant was not
assignee of the whole premises; he did not take and does not
hold the whole term of the original lessee."

In *St. Clair* v. *Williams.* 7 Ohio (pt. 2), 110, it is said: "The
assignee is he who holds the whole estate or term."

In *Worthington* v. *Ballauf,* 7 Bull., 46; 10 Rec., 505, it is said,
as to what constitutes an assignment of a lease, "it is unnec-
essary to observe further than it must convey to the assignee
the whole of the term and the whole estate of the lessee.   If a
day of the term or a particle of the estate be reserved, the trans-
action is not an assignment but a subletting."

In *Powder* v. *Neiss,* 7 N.P.(N.S.), 1, Margaret Herb leased to
one Neiss for a term of years.   During the term Neiss leased
for the remainder of the term to one Tschirret.· Before the

end of the original term Tschirret, by written instrument, let the premises to plaintiff, Powder, at the same rental, and again for the whole of the unexpired term.   Subsequently Herb, the original lessor, brought suit before a justice in forcible entry and detainer against Neiss, lessee, Tschirret, sublessee, and Powder, second sublessee, and recovered a judgment of restitution. Neiss did not appear, and Powder, second sublessee, paid Herb, .the original lessor, $100 in consideration of her allowing him to remain the balance of the original term.   Powder sued Neiss for the $100.   Judgment for defendant.

On page 4 the court says:   ''There was a question of assignment or subletting.''

And on page 5:

''The only thing that can be urged, and in fact is urged, in support of the position taken by the plaintiff in that regard, is the fact that the time limit named in the two leases is identical. But the authorities cited seem to me to clearly show that the word 'term' does not merely signify the time specified in the lease, but the estate also, and it is an elementary principle in interpreting all contracts that, if the intention of the parties is clear from the instrument itself, the intention should govern. How then can it be contended in this case that such was the purpose of drawing up that formal instrument, specifically setting forth the intention of these parties, their agreement with reference to this property, not only as to the amount as to the time that the contract should run, but that at the end of that time the property should be re-delivered to Tschirret; that it should be re-delivered to him if the rents were not paid to him; or if statutes of the state of the rules prescribed by the board of health are not complied with; or if liquors are sold in the premises contrary to the law governing the same, etc. ' And if Tschirret may enter under a forfeiture of the lease, has he not something there, some interest?   Did not this agreement contemplate some interest in Tschirret?   The term of this lease did not mean merely the time it had to run, but it had some reference also to the estate that was conveyed.''

These seem to be all the Ohio authorities, but many cases of both sides have been cited to me from other jurisdictions.

Dunlap v. Bullard, 131 Mass., 161, 162; suit on covenant to pay taxes.  Entire term leased, increased rent, with right of

re-entry for breach of covenant. *Held*: A sub-lease and not an assignment. On page 162 the court says:

"It is clear that the parties to this lease intended to create the relation of landlord and tenant between themselves. And it is the duty of the court to give effect to this intention, unless controlled by some positive rule of law.

"To constitute an assignment of a leasehold interest, the assignee must take precisely the same estate in the whole or in a part of the leased premises which his assignor had therein. He must not only take for the whole of the unexpired time, but he must take the whole estate, or, in other words, the whole term; for, in the language of Blackstone, the word 'term' does not merely signify the time specified in the lease, but the estate also and interest that passes by that lease."

To the same effect are, *Drake* v. *Lacoe*, 157 Pa. St., 17, 38; *Wheeler* v. *Hill*, 16 Mo., 329. 334; *Collamer* v. *Kelley*, 12 Ia., 319, 323; *Jones* v. *Kansas City*, 99 Mo. App., 433; *Mayhew* v. *Hardesty*, 8 Md., 479, 495; *Townsend* v. *Read*, 15 Abb. N. C. (N. Y.), 285.

The New York court seem to have great difficulty in arriving at harmony on this question. The early cases were to the effect that if the lessee demised his whole term, at different rent and with the right of re-entry for breach of covenants, it was a sub-lease and not an assignment. *Post* v. *Kearney*, 2 N. Y., 394; *Martin* v. *O'Connor*, 43 Barb., 514; *Collins* v. *Hasbrouck*, 56 N. Y., 157; *Ganson* v. *Tifft*, 71 N. Y., 48, 54, 55.

But in 1886 (102 N. Y., 601), came the case of *Stewart* v. *Long Island Railroad Co.*, which plainly and clearly reversed all the prior holdings in New York, though the judge who wrote the opinion attempted to distinguish that case from the earlier decisions. It is to be noted also that there is a very strong dissenting opinion by Judge Finch. If the doctrine as laid down in that case is the law of Ohio, then the making of the ninety-nine year lease from the Commercial Real Estate Company to Brown is an assignment. Nor will the fact that the Commercial Real Estate Company had an option to purchase, nor the fact that they intended to elect to purchase, and that they had the $90,000 ready to tender on the day named,

avail them if *Stewart* v. *Railway, supra,* is to be followed, for that case holds that an estate to arise *in futuro* can not be tacked onto the estate of a lessee who has assigned his whole term, so as to create a reversion in him. Rapallo, J., in writing his opinion, frequently uses the term "reversion." That, in order to prevent an assignment, there must be some "reversion left in the lessee." "The lessee must be a reversioner."

Blackstone had stated the rule in *Dunlap* v. *Bullard, supra,* that if the lessee retain some estate, some interest, then it was an underletting and not an assignment.

In *Fulton* v. *Stuart, supra,* the court says the second lessee must hold the "whole term" of the lessee; and in *St. Clair* v. *Williams, supra,* says that the assignee is he who holds the "whole estate or term," while *Jones* v. *Smith, supra,* says that it must be the "whole term and the whole interest;" and furniture not being conveyed, it was held that the whole interest was not conveyed.

This same language is used in *Worthington* v. *Ballauf,* and *Powder* v. *Neiss, supra.*

The contract in question between Cross, Pack and Vliet was an entire contract relating to two subjects of the law, a lease for fifteen years and an option to purchase on the last day of the term. It was one indenture, one contract and supported by one consideration. If each of the parties to that contract did as he had agreed to do with reference to the option, the defendant should, on the last day of the lease, have had a deed to the premises and would have been the owner of the fee before the lease expired. It is true that, as soon as the defendant had executed the ninety-nine year lease to Brown, on March 10, 1909, the defendant had no reversion left in him, but if the cases of Ohio are properly construed by me, the lessee, the Commercial Real Estate Company, after the execution of the ninety-nine year lease, still had some interest in the premises— they had intended to have. They might re-enter for violation or breach of Brown's covenants. They had a larger rent reserved; a better and more expensive building was provided for; there were different covenants as to insurance, and they had a valid,

legal, enforcible contract with the owner whereby they could, on the last day of the term, become the owners of the fee.

I am bound to say that this holding is flying in the face of the text-books and many decisions, but the weight of the reasoning, according to my judgment, is that there was no assignment, and the court so holds.

Very able briefs have been presented in this case. The court is fortunate in having had the case so well presented. Every case cited has been in point, and in over three hundred pages of brief I have not found a single wrong quotation.

Finding as I do, it is not necessary for me to discuss Dumper's case, but I desire to say that I trust the law of that case will never be adopted in Ohio.

After a careful reading of the briefs and a consideration of the facts, I find no waiver and no estoppel.

The petition is dismissed, and decree of specific performance on the cross-petition.